Selena WASHINGTON; and Jorge Nater, individually and on behalf of all other persons similarly situated, Plaintiffs,

v.

Robert VOGEL, individually and in his official capacity as Sheriff of Volusia County, Florida; and Volusia County, Florida, Defendants.

No. 93–482–Civ–Orl–22.

United States District Court, M.D. Florida, Orlando Division.

June 14, 1994.

Luis F. Gomez, Orlando, FL, Charles Gilbert Burr, III, Melanie Locklear, Charles G. Burr, P.A., Tampa, FL, Dennis Courtland Hayes, Willie Abrams, NAACP Special Contribution Fund, Baltimore, MD, E.E. Edwards, Edwards & Simmons, P.A., Nashville, TN, James Edward Clark Perry, Law Office of James E.C. Perry, Orlando, FL, for plaintiffs.

David V. Kornreich, Jeffrey E. Mandel, Muller, Mintz, Kornreich, Caldwell, Casey, Crosland & Bramnick, P.A., Orlando, FL, for defendants.

### *MEMORANDUM DECISION*
### *AND ORDER*

CONWAY, District Judge.

This cause comes before the Court for consideration of Plaintiffs' Motion for Class

Certification (Dkt. 36), filed November 30, 1993, and Plaintiffs' Amended Motion for Class Certification (Dkt. 89), filed April 18, 1994. The Court has held an evidentiary hearing, and has reviewed the parties' evidence and legal memoranda concerning class certification issues.

## I. BACKGROUND AND PROCEDURAL HISTORY

The plaintiffs in this case are the Florida State Conference of NAACP Branches ("the NAACP"), Selena Washington ("Washington") and Jorge Nater ("Nater"). They have sued Volusia County, Florida ("the County"), and Robert Vogel ("Vogel"), the Sheriff of the County. The plaintiffs contend that the defendants had, and continue to have, a policy of targeting African–Americans and Hispanics for pretextual traffic stops on Interstate 95 in Volusia County, for the purpose of seizing property (primarily cash) from those persons stopped. The traffic stops in question were made by members of the Selective Enforcement Team ("the SET Unit"), a unit within the Volusia County Sheriff's Office ("VCSO"). The plaintiffs assert claims pursuant to 42 U.S.C. §§ 1981 and 1983. They seek compensatory and punitive damages, an injunction, and an award of fees and costs.

The Second Amended Complaint (Dkt. 78) requests class certification pursuant to Rule 23(b)(2), Federal Rules of Civil Procedure. To that end, the plaintiffs have filed the instant motions seeking class certification. Plaintiffs request certification of the following subclasses:

(a) all African–American and Hispanic motorists whose vehicles were stopped by officers of the VCSO's SET Unit between January 1, 1989 and December 31, 1993, who were not arrested, and who had their property seized ("subclass (a)");

(b) all African–American and Hispanic motorists whose vehicles were stopped by officers of the VCSO's SET Unit between January 1, 1989 and December 31, 1993, who were not arrested, and who did not have their property seized ("subclass (b)"); and

(c) all African–American and Hispanic motorists who expect to travel in or through Volusia County, Florida in the future ("subclass (c)").

Washington and Nater, the two named individual plaintiffs, seek to act as class representatives. Washington, a resident of South Carolina, is African–American. On April 24, 1990, a car in which she was a passenger was stopped by a member of the SET Unit on I–95. SET Unit members searched the car, finding and confiscating $19,000 in cash allegedly belonging to Washington. Pursuant to a written settlement agreement, the County later returned $15,000 to Washington and her nephew[1], and kept the balance of the cash.

Nater, who lives in Puerto Rico, is Hispanic. On February 4, 1991, a car in which he was riding was stopped by a member of the SET Unit. Following a search of the vehicle, the SET Unit confiscated $36,990 in cash, allegedly belonging to Nater. The County and Nater later entered into a settlement agreement, pursuant to which the County kept $6,000 and returned $30,990 to Nater.

## II. STANDING

A threshold issue[2] is whether Washington, Nater and the NAACP have standing to seek an injunction.[3] See Warth v. Seldin, 422

---

[1.] The settlement agreement identified both Washington and her nephew, Jonathan Washington, as the owners of the cash.

[2.] The plaintiffs contend the Court has already decided standing issues. Specifically, the plaintiffs argue that the Court's March 16, 1994 Order (Dkt. 76) denying the defendants' motion to dismiss resolved standing issues against the defendants. However, that Order expressly stated that the motion to dismiss was "denied as moot." The Court disposed of the motion to dismiss in that manner, and did not reach the issues (including standing) raised therein, because after the motion was filed, the plaintiffs sought, and received, leave to serve a second amended complaint. The defendants have challenged the named plaintiffs' standing in their memoranda opposing class certification. Hence, standing issues remain unresolved.

[3.] The defendants have not challenged Washington's and Nater's standing to seek monetary relief. Moreover, the NAACP apparently recognizes that it does not have standing to assert its members' claims for monetary relief. See Plaintiffs' Supplemental Memorandum in Support of Motion for Class Certification (Dkt. 96) ("Plain-

U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (standing is threshold question in every federal case); *Griffin v. Dugger,* 823 F.2d 1476, 1482 (11th Cir.1987) ("Only after the court determines the issues for which the named plaintiffs have standing should it address the question whether the named plaintiffs have representative capacity, as defined by Rule 23(a), to assert the rights of others"), *cert. denied,* 486 U.S. 1005, 108 S.Ct. 1729, 100 L.Ed.2d 193 (1988).

### A. Individual Standing

#### 1. Relevant Law

Federal court jurisdiction depends upon the existence of an actual case or controversy. *City of Los Angeles v. Lyons,* 461 U.S. 95, 101, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983). More specifically,

[p]laintiffs must demonstrate a personal stake in the outcome in order to assure that concrete adverseness which sharpens the presentation of issues necessary for the proper resolution of constitutional questions. Abstract injury is not enough. The plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical.

*Id.* at 101–102, 103 S.Ct. at 1665. (citations and quotations omitted).

■ When a victim of alleged police misconduct seeks an injunction prohibiting future such misconduct, his standing depends on a showing that he faces a real and immediate threat that he will again suffer from the misconduct. *Id.* at 105–106, 103 S.Ct. at 1666–1667. However, one "who has standing to bring a damages claim does not automatically have standing to litigate a claim for injunctive relief arising out of the same set of operative facts." *Tucker v. Phyfer,* 819 F.2d 1030, 1034 (11th Cir.1987) (citing *Lyons* ).

In *Lyons,* the plaintiff was an African–American who had been stopped for a traffic violation by City of Los Angeles police offi-

cers. Without provocation, the officers applied a department-authorized "chokehold" to Lyons, rendering him unconscious and damaging his larynx. Lyons sued the City and the officers, seeking damages, declaratory relief, and both preliminary and permanent injunctions. In the count for injunctive relief, Lyons alleged that

numerous persons have been injured as the result of the application of the chokeholds, that Lyons and others similarly situated are threatened with irreparable injury in the form of bodily injury and loss of life, and that Lyons justifiably fears that any contact he has with Los Angeles Police officers may result in his being choked and strangled to death without provocation, justification or other legal excuse.

*Lyons,* 461 U.S. at 98, 103 S.Ct. at 1663 (quotations omitted).

The district court entered judgment for the City on Lyons' claims for injunctive and declaratory relief. The Court of Appeals for the Ninth Circuit reversed, holding that Lyons had standing to seek injunctive and declaratory relief. Specifically, the Court of Appeals held that "there was a sufficient likelihood that Lyons would again be stopped and subjected to the unlawful use of force to constitute a case or controversy and to warrant the issuance of an injunction, if the injunction was otherwise authorized." *Id.* at 99. The Supreme Court denied certiorari.

On remand, Lyons sought a preliminary injunction. The district court granted the motion, enjoining the use of chokeholds under circumstances that did not present a threat of death or serious bodily injury. The Court of Appeals affirmed the preliminary injunction.

The Supreme Court reversed. The Court determined that Lyons had not established the existence of a case or controversy that would justify an injunction. In the Court's view, Lyons could not have standing to seek an injunction unless he was likely to suffer future injury from the use of chokeholds. The Court noted that five months had passed from the time of the choking incident to the

---

tiffs' Supplemental Memorandum") at 8 (stating that the NAACP seeks injunctive relief only). Ac-

cordingly, the Court need not address standing to claim monetary relief.

filing of the complaint. The Court stated that while the prior incident would "presumably [afford] Lyons standing to claim damages", it did not "establish a real and immediate threat that [Lyons] would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part." *Id.* at 105, 103 S.Ct. at 1667. Further, the Court characterized Lyons' allegation that Los Angeles police routinely applied unwarranted chokeholds as "fall[ing] far short of the allegations that would be necessary to establish a case or controversy between these parties." *Id.* at 105, 103 S.Ct. at 1667. Reinforcing that the proper focus was on the prospect of future injury to Lyons, rather than to the general citizenry, the Court stated:

> Absent a sufficient likelihood that he will again be wronged in a similar way, Lyons is no more entitled to an injunction than any other citizen of Los Angeles; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional.

*Id.* at 111, 103 S.Ct. at 1670 (citations omitted).

The Court rejected Lyons' "capable of repetition, yet evading review" argument. First, the Court stated that Lyons' claim that he was illegally choked did not evade review, since the claim would be litigated in his suit for damages. Second, the Court stated that the doctrine generally applied only when a plaintiff "can make a reasonable showing that he will again be subjected to the alleged illegality", and that Lyons had made no such showing. *Id.* at 109.

The Court concluded by reiterating that Lyons was not left without a remedy.

> [W]ithholding injunctive relief does not mean that the federal law will exercise no deterrent effect in these circumstances. If Lyons has suffered an injury barred by the

Federal Constitution, he has a remedy for damages under § 1983. Furthermore, those who deliberately deprive a citizen of his constitutional rights risk conviction under the federal criminal laws.

*Id.* at 112–113, 103 S.Ct. at 1669 (citations and quotations omitted).

### 2. *Washington's Standing*

■ To have standing to seek injunctive relief, Washington must initially demonstrate that she faces a real and immediate threat of again being stopped on I–95 by a VCSO officer.[4] Washington has not satisfied this requirement.

In *Lyons*, the Supreme Court seemingly found it significant that five months had elapsed from the time of the choking incident to the time Lyons filed suit. Here, more than three years passed from the time Washington was stopped to the time she filed suit. It has now been more than four years since the stop. There is no indication that Washington has again been stopped on I–95, or anywhere else in Volusia County, by a member of the VCSO. These circumstances suggest a diminished likelihood that Washington will again be stopped.

Indeed, the plaintiffs have not demonstrated, or even alleged, that Washington will be in a position to be stopped by a VCSO officer in the near future. As previously noted, Washington lives in South Carolina. During her July 1993 deposition, Washington testified that she traveled to Miami at least twice after the stop and seizure, for the purpose of seeing her forfeiture attorney. Deposition of Selena Washington (Dkt. 51) ("Washington Depo.") at 232. Washington further testified that she was in Miami in June 1993 for the purpose of receiving spiritual training. Washington Depo. at 243–46. When questioned concerning how many more times she would have to go to Miami to receive that training, Washington replied that she could not say.[5] Washington Depo. at 247. Wash-

---

4. Of course, whether the VCSO presently uses a race-based profile is also relevant to the standing issue. However, before that question need be reached, Washington must demonstrate the existence of a real and immediate threat that she will again be stopped.

5. The precise question and answer were as follows:

ington also testified that she had relatives in Coconut Grove. *Washington Depo.* at 249–251. However, Washington did not testify that she planned to visit those relatives in the near future. Moreover, Plaintiffs' counsel have not alleged or presented any evidence that Washington will travel through Volusia County anytime soon.

The plaintiffs argue that evidence of repetitive stops of other minority motorists on I–95 between 1989 and 1993 suggests that any African–American or Hispanic who travels on I–95 might be stopped more than once. On this basis, the plaintiffs contend that Washington faces a realistic threat of recurring harm. However, such evidence is insufficient to establish a case or controversy for injunctive relief between these parties. *See Lyons,* 461 U.S. at 105, 103 S.Ct. at 1667 (allegation that police "routinely apply chokeholds in [unauthorized circumstances] falls far short of the allegations that would be necessary to establish a case or controversy between these parties").

In sum, the plaintiffs have failed to demonstrate, or even allege, that Washington faces a real and immediate threat of being stopped by a member of the VCSO. Washington did not have standing to seek an injunction at the time she filed suit, and she does not now. Accordingly, Washington's claim for injunctive relief will be dismissed for lack of jurisdiction.

### 3. Nater's Standing

■ The possibility that Nater will again be stopped by a VCSO officer is perhaps even more remote. As mentioned, Nater lives in Puerto Rico. He has returned to Orlando, Florida, at least twice[6] since his money was seized. Presumably, he also will attend the trial of this action in Orlando. However, there is no indication that his trav-

els to Florida in connection with this lawsuit have required, or will require, him to pass through Volusia County. Moreover, Nater has not alleged or presented any evidence that he intends to travel to, or through, Volusia County in the future. Further, Nater became a party to this suit more than 2½ years after he was stopped. It has now been more than three years since the stop. The plaintiffs have not offered any evidence that Nater has been stopped by a member of the VCSO during the intervening period.

The plaintiffs have not alleged or otherwise demonstrated that Nater faces a realistic threat of again being stopped by a VCSO officer. Nater, like Washington, did not have standing to seek an injunction when he became a party to this suit, and he does not now. Hence, Nater's claim for injunctive relief must be dismissed.

Before addressing the NAACP's standing, this Court feels compelled to agree that *Lyons* seemingly "render[s] [the federal courts] impotent to order the cessation of a policy which may indeed be unconstitutional and may harm many persons." *Williams v. City of Chicago,* 609 F.Supp. 1017, 1020 n. 7 (N.D.Ill.1985). This is because most persons like Washington and Nater will be unable to show a real threat of future injury. However, any disagreement this Court has with *Lyons* is irrelevant. The Supreme Court has spoken, the Court of Appeals for the Eleventh Circuit has followed *Lyons* (as it is bound to do), and this Court is constrained to do likewise. Unless the NAACP has associational standing, this Court is powerless on the present record to enter an injunction against the alleged police practices at issue in this case, and the only remedy available to the plaintiffs will be an award of money damages.[7]

---

Q. All right. How much longer do you have to go back down to Miami for?

A. I can't say that. I might go to Haiti. If when the thing finish in Haiti, then I'll go over to Haiti.

Washington Depo. at 247.

**6.** In January 1994, Nater was deposed at a law office in Orlando. He also attended the class certification hearing, held at the federal courthouse in Orlando on April 21, 1994.

**7.** Of course, "those who deliberately deprive a citizen of his constitutional rights [also] risk conviction under the federal criminal laws." *Lyons,* 461 U.S. at 113, 103 S.Ct. at 1671. However, the question whether federal criminal laws have been violated is necessarily beyond the scope of this civil suit and must be addressed, if at all, in other proceedings.

## B. NAACP's Standing

■ An association may have standing in its own right to seek judicial relief for injury to itself. *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975). Moreover, "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members." *Id.* Since it has not demonstrated (or even alleged) injury to itself (as distinguished from injury to its members), the NAACP does not have standing to seek injunctive relief in its own behalf. It must be determined, then, whether the NAACP has standing to seek an injunction on behalf of one or more of its members.

On March 21, 1994, the plaintiffs filed a Second Amended Complaint alleging as follows:

> The NAACP has individual members who are African–American and Hispanic motorists and who either reside in Volusia County or travel in or through Volusia County, where African–American and Hispanic motorists have been stopped in the past and may be stopped in the future on the basis of their race by the VCSO. Individual NAACP members have been injured by the actions complained of herein.

Second Amended Complaint (Dkt. 78) at para. 8. However, one month later, plaintiffs' counsel disclosed at the class certification hearing that plaintiffs had not yet identified any particular NAACP member who had been so injured. Transcript of Hearing on Class Certification Motion (Dkt. 94) ("Hearing Transcript") at 39–40. The Court reserved ruling on the question of the NAACP's standing, and gave counsel leave to further brief the issue. Hearing Transcript at 43.

On May 16, 1994, the plaintiffs filed their Supplemental Memorandum, which, in part, addressed the NAACP's standing. On that subject, the Supplemental Memorandum stated:

> [T]he plaintiffs now have identified a putative class member who also was a member

of the NAACP at the time when his car was stopped and searched in February 1991 by a deputy assigned to the SET unit. The member of sub-class (b), Larry Miller, was then and is still a member of the NAACP's New Smyrna Beach Branch, which is part of the Florida State Conference of NAACP Branches. At the time when his car was stopped and searched, Miller complained that his civil rights were being violated because he had committed no traffic infraction justifying the stop. A newspaper article written shortly after the incident stated that "it is [Miller's] belief that the deputy targeted him for the stop because he is a Black male driving a late model imported car." [8]

Plaintiffs' Supplemental Memorandum at 8–9.

■ The plaintiffs have not provided the Court with any support for the bare, unsworn statements of plaintiffs' counsel concerning Larry Miller's NAACP membership. There is simply no evidence before the Court establishing that Larry Miller was, or is, a member of the NAACP. When standing is contested, a plaintiff must plead and prove injury in fact, causation and redressability. *See E.F. Hutton & Co., Inc. v. Hadley,* 901 F.2d 979, 984 (11th Cir.1990); *Steele v. National Firearms Act Branch,* 755 F.2d 1410, 1414 (11th Cir.1985). Were this case at the motion to dismiss stage, the Court would be required to accept as true the plaintiffs' allegations concerning standing. *Hadley,* 901 F.2d at 983; *Steele,* 755 F.2d at 1414. However, this case has progressed well beyond that stage. The action has been pending for nearly a year. The parties have engaged in extensive discovery. In fact, the deadline for completion of all discovery is imminent. *See* Pretrial Procedure and Scheduling Order (Dkt. 31) (establishing discovery completion date of July 1, 1994). Under these circumstances, the plaintiffs cannot rest on mere allegations in the pleadings or unsupported statements of counsel.

■ Even if it were established that Larry Miller is a member of the NAACP, the plain-

---

**8.** The plaintiffs did not attach a copy of the newspaper article to their Supplemental Memo- randum.

tiffs have furnished no evidence from which the Court can determine whether Miller faces a real and immediate threat of again being stopped by a member of the VCSO. This is significant because, unless an organization claims injury to itself, its standing can be no greater than that of the individuals it seeks to represent. *See Valley Forge College v. Americans United,* 454 U.S. 464, 477 n. 14, 102 S.Ct. 752, 761 n. 14, 70 L.Ed.2d 700 (1982).

Based on the foregoing, the Court determines that the NAACP does not have standing to assert a claim for injunctive relief on behalf of its members. Inasmuch as the NAACP lacks standing to assert its only claim in this case, it must be dismissed as a party.

### III. CLASS CERTIFICATION PURSUANT TO RULE 23(b)(2)

■ A plaintiff seeking class certification must show, *inter alia,* (1) that he is "qualified to represent the members of the class in accordance with the four prerequisites of Rule 23(a) [,Federal Rules of Civil Procedure][9]", and (2) that "the action [is] one of the three types Rule 23(b)(2) identifies." *Griffin v. Dugger,* 823 F.2d 1476, 1482 (11th Cir.1987), *cert. denied,* 486 U.S. 1005, 108 S.Ct. 1729, 100 L.Ed.2d 193 (1988). Concerning the second element identified above, the plaintiffs have consistently sought class certification only under Rule 23(b)(2).[10] *See*

---

**9.** The prerequisites of Rule 23(a) are:
(1) the class is so numerous that joinder of all members is impracticable,
(2) there are questions of law or fact common to the class,
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and
(4) the representative parties will fairly and adequately protect the interests of the class.

**10.** Rule 23(b)(2) applies when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Rule 23(b)(2), Federal Rules of Civil Procedure.

**11.** The fact that the named plaintiffs also assert claims for money damages does not remedy their lack of standing to seek class injunctive relief.

Complaint (Dkt. 1) at para. 14; First Amended Complaint (Dkt. 35) at para. 15; Motion for Class Certification (Dkt. 36) at 6; Hearing Transcript (Dkt. 94) at 7. They have not sought alternative certification under either Rule 23(b)(1) or 23(b)(3).

Washington and Nater, the proposed class representatives, have no standing to seek injunctive relief for themselves. Accordingly, they cannot seek injunctive relief on behalf of the class. *See Warth v. Seldin,* 422 U.S. 490, 502, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975) ("Unless these petitioners can thus demonstrate the requisite case or controversy between themselves personally and respondents, 'none may seek relief on behalf of himself or any other member of the class' ", citing *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974)); *Daley's Dump Truck Serv. v. Kiewit Pac. Co.,* 759 F.Supp. 1498, 1501 (W.D.Wash. 1991) ("If the plaintiff has no standing individually, then no case or controversy arises, and the plaintiff's claims are not typical of the claims of those who might otherwise litigate the action", citing 1 H. Newberg, *Newberg on Class Actions* (2d ed. 1985) § 2.07 at 56), *aff'd sub nom., Imagineering, Inc. v. Kiewit Pac. Co.,* 976 F.2d 1303 (9th Cir.1992); *Magnuson v. City of Hickory Hills,* 730 F.Supp. 1439, 1442 (N.D.Ill.1990) (class action cannot be certified unless named plaintiff has standing), *aff'd,* 933 F.2d 562 (7th Cir.1991).[11] Moreover, the Second

*See Tucker v. Phyfer,* 819 F.2d 1030, 1035 (11th Cir.1987) (affirming district court's denial of class certification on ground that plaintiff's claims for declaratory and injunctive relief were moot; since plaintiff's "claim for declaratory and injunctive relief was moot at the time he requested the court to certify a class and to name him as class representative", the "district court was required, under *Lyons,* to dismiss this claim for lack of standing, [plaintiff's] live claim for money damages notwithstanding"); *Robinson v. City of Chicago,* 868 F.2d 959, 967 (7th Cir.), *cert. dismissed sub nom., Doulin v. City of Chicago,* 493 U.S. 1012, 110 S.Ct. 708, 107 L.Ed.2d 729 (1989), *cert. denied sub nom., Richardson v. City of Chicago,* 493 U.S. 1035, 110 S.Ct. 756, 107 L.Ed.2d 773 (1990); *Magnuson,* 730 F.Supp. at 1443 (denying Rule 23(b)(2) class certification on basis named plaintiffs lacked standing to seek injunctive relief; rejecting argument that plaintiffs' compensatory damages claims guaranteed that they would vigorously protect interests of

Amended Complaint does not pray for declaratory relief. Since the proposed class representatives do not have standing to seek an injunction, and the plaintiffs have not asserted a claim for declaratory relief, the class cannot be certified pursuant to Rule 23(b)(2). Plaintiffs' Motion for Class Certification, seeking certification only under Rule 23(b)(2), must be denied.

## IV. CONCLUSION

Selena Washington, Jorge Nater and the NAACP do not have standing to seek injunctive relief. Accordingly, Washington's and Nater's claims for injunctive relief must be dismissed, and the NAACP must be dismissed as a party. Further, since proposed class representatives Washington and Nater lack standing to seek an injunction, the Court cannot certify this case as a class action pursuant to Rule 23(b)(2), Federal Rules of Civil Procedure.

Based on the foregoing, it is ORDERED as follows:

1. Selena Washington's and Jorge Nater's claims for injunctive relief are DISMISSED.

2. The NAACP is DISMISSED from this action.

3. Plaintiffs' Motion for Class Certification (Dkt. 36) and Amended Motion for Class Certification (Dkt. 89) are DENIED.

DONE AND ORDERED.

class). Moreover, even if Washington's and Nater's individual damages claims did somehow give them standing to seek class injunctive relief, the fact remains that they cannot individually seek an injunction. Accordingly, they do not meet the Rule 23(a) requirements of typicality, commonality and adequacy of representation.